370 F.2d 441
 CHUGACH ELECTRIC ASSOCIATION, a corporation, Petitioner,
v.
UNITED STATES DISTRICT COURT FOR the DISTRICT OF ALASKA AT
ANCHORAGE and theHonorable Raymond E. Plummer,
Judge, Respondents.
 No. 20568.
 United States Court of Appeals Ninth Circuit.
 Dec. 22, 1966, Rehearing Denied Feb. 6, 1967.
 
 Ronald McKinstry, of Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for petitioner.
 Donald J. Merriman, Edgar Paul Boyko, Los Angeles, Cal., Charles Tulin, William J. Moran, Raymond E. Plummer, U.S. Dist. Judge, Groh & Benkert, Anchorage, Alaska, for respondents.
 Before MERRILL, BROWNING and DUNIWAY, Circuit Judges.
 MERRILL, Circuit Judge.
 
 
 1
 Petitioner is defendant in an action before respondent court brought by the trustee in bankruptcy of Mrak Coal Company. Petitioner moved to disqualify the trustee's attorney, Edgar Paul Boyko, on the ground of conflict of interest contrary to the Canons of Ethics.[1] The motion was denied by respondent court. That ruling not being appealable, Cord v. Smith, 338 F.2d 516 (9th Cir. 1964), petitioner brought this proceeding for a writ of mandamus directing the disqualification under 28 U.S.C. 1651 (1964).
 
 
 2
 We here rule that disqualification is required. The decision is regretfully reached since an actual conflict of interest is not clearly established and from a study of the record we are satisfied of Mr. Boyko's good faith in resisting disqualification. Nevertheless, we conclude that this is a case in which an attorney must, at the instance of the adversary, his former client, stand aside.
 
 
 3
 Petitioner generates and sells electrical power in south central Alaska. Mr. Boyko served as its general counsel from October 1954 to April 1956 and subsequently served as consultant from July 1956 to April 1957.
 
 
 4
 The action brought by Mrak's trustee with Mr. Boyko as counsel charges petitioner with violations of the federal antitrust laws in efforts to retain its monopoly position as the sole company in the area engaged both in the generating and sale of electrical power. It is alleged that Mrak's bankruptcy resulted from these violations.
 
 
 5
 The trustee alleges that petitioner's monopoly position was threatened by the plans of another power retailer, Matanuska Electric Association, to acquire its own generating facilities; that petitioner conspired to deprive Matanuska of its source of coal by destroying the two principal coal suppliers, Mrak and Evan Jones Coal Co.; that a part of its scheme was to maneuver Mrak into a position of economic dependence on petitioner and then destroy Mrak by withdrawing its support and switching to natural gas as fuel.
 
 
 6
 Further background is recited in the opinion of the District Court:
 
 
 7
 'Over a period of time a very definite cleavage developed among the (Chugach) Board members. This eventually resulted in four Board members being strongly pro-management and three Board members anti-management. Both groups were vigorous and publicly vocal in their criticism of the other group and in advocating their respective positions.
 
 
 8
 'For a period of at least several years the open and public disputes between the Board members and the efforts of the majority members to remain a majority and the efforts of the minority members to become the majority resulted in many public statements and discussions. As a result the annual meeting and election of directors of C.E.A. was a matter of general interest to those residing in the Anchorage area.
 
 
 9
 'At the annual meeting and election of C.E.A. in 1957 the anti-administration forces succeeded in electing a majority of the Board and the principal officers of the corporation.
 
 
 10
 'Inasmuch as Boyko had been in direct conflict with the advocated programs and policies of what had theretofore been a minority of the Board and subsequent to the election became a majority, he, on April 6, 1957, submitted his resignation.'
 
 The court concluded:
 
 11
 'Subsequent to the acceptance of Boyko's resignation on April 6, 1957, and sometime in or about July, 1957, the exact date being unknown, the activities on which the present case is predicated began.
 
 
 12
 'There has been no showing that during Boyko's employment as general counsel for C.E.A. prior to April 6, 1957, he received or had access to secret or confidential information related to the issues in the present case.
 
 
 13
 'The court concludes that C.E.A., to date, has failed to establish that there is a 'substantial relationship' between the issues in the present case and the subject matter of Boyko's former representation. The motion to disqualify is denied.'
 
 
 14
 In our view the District Court's findings and conclusions do not reach the heart of the problem. In their prohibition of conspiracies the antitrust laws are concerned not only with what was done but with why it was done. The problem here is not limited to the question whether Mr. Boyko was connected with petitioner as its counsel at the time agreements were reached and overt acts taken,[2] but includes the question whether, as attorney, he was in a position to acquire knowledge casting light on the purpose of later acts and agreements. The policies of the new board majority, pursuant to which the alleged violations occurred, presumably reflected the expressed views and attitudes of the old minority. Antitrust views and attitudes are not likely to be expressed in open meeting or public debate, and public airing of the board's cleavage does not eliminate the probability that information respecting purpose and expectation, available to the company attorney, was not made public.
 
 
 15
 A likelihood here exists which cannot be disregarded that Mr. Boyko's knowledge of private matters gained in confidence would provide him with greater insight and understanding of the significance of subsequent events in an antitrust context and offer a promising source of discovery. This likelihood is enhanced by recognition of the fact that the allegations of a complaint are not always an accurate appraisal of the relevant period of time in antitrust cases. Discovery and trial proof frequently introduce ramifications rendering earlier events relevant.
 
 
 16
 The petitioner does not have the burden of specifying the secret and confidential information which was available to Mr. Boyko. Such specification might entail disclosure of the very confidences the Canons seek to protect. It must be remembered that the attorney in such situations as this does not have the shelter enjoyed by a defendant whose adversary must meet a burden of proof. Where conflict of interest or abuse of professional confidence is asserted, the right of an attorney freely to practice his profession must, in the public interest, give way in cases of doubt.
 
 
 17
 The District Court is directed to set aside its order denying petitioner's motion to disqualify Edgar Paul Boyko, and to enter an order of disqualification.
 
 
 
 [1]
 Canons 6 and 37 of the Canons of Professional Ethics of the American Bar Association, adopted by the Supreme Court of Alaska in 1963:
 '6. Adverse Influences and Conflicting Interests.
 'The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.'
 '37. Confidences of a Client.
 'It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client.'
 
 
 [2]
 Even upon this question the record raises doubts. In his original complaint the trustee alleged a 1956 agreement between petitioner and Evan Jones, pursuant to which Evan Jones during that year ceased buying coal from Mrak and refrained from bidding against Mrak on a lucrative contract with petitioner, thus initiating the program by which Mrak's dependence on petitioner was to be accomplished. In his amended complaint, filed after petitioner had moved to disqualify Mr. Boyko, the trustee eliminated all reference to the 1956 agreement and events